Good morning, Your Honors. May it please the Court, Nicholas Beran, pro bono attorney for the petitioners. I would like to reserve two minutes for a moment. Sure, Counsel. Just watch your own time, please. It'll count down. Thank you. You bet. The focus of this appeal is on the asylum claim of Ms. Zelaya Reyes, the wife and mother of the petitioner family. Her husband, Lieutenant Ordonez, arrested the notorious leader of the Atlantic Drug Cartel, Adan Montes Bobadilla, with 420 kilos of cocaine. This was in July of 2003, at which time Mr. Bobadilla told him to his face, kill me now or you will regret it later. And that's when the fear of his wife started. And this case is about his wife today. And the main issues before the Court are, did Ms. Zelaya suffer harm? And if she did suffer harm, did it rise to the level of persecution? And was that persecution on account of one of the protected grounds in the asylum statute? And finally, is there a well-founded fear of future persecution? It is our position that Ms. Zelaya indeed suffered harm. The day she came into her home to find her nanny handcuffed to a pipe in the bathroom, severely beaten, and her two-year-old toddler on a bed unattended, then having learned from the nanny that the assailants had pointed a gun at the head of her son and had contemplated kidnapping him. Now, if that isn't personal harm to a parent, I'm not sure what is. How do we know that the assailants were, I guess, sent by the drug lord person? Or have some connection to him? That's pretty much a circumstantial evidence question. I mean, the... Did the assailants say anything to the effect that, you know, we know who you're... Yes, they told the nanny, they wanted to know where's Ordonez, where's Lieutenant Ordonez? When does he go to work? How does he get to work? They had black uniforms on, similar to military. They had masks. They had never been threatened or harmed before he had arrested Mr. Bobadilla. So it's fairly... There's a good presumption that these people were related to Bobadilla. And that was confirmed a month later when Lieutenant Ordonez was testifying against two underlings he had arrested of Bobadilla's. And they got the death threat phone call, essentially. Their cousin was their bodyguard, he was also in the Navy, was at the home when the phone call came in saying, tell the dog the hunt has begun. You know, if you talk, we know where your family is, we know where your daughter is. So that was a pretty direct threat. Now, granted that Niselaya was at work at the time. The bodyguard called Niselaya and said, stay there, we're gonna come get you. There's been a threat, a phone call, don't move. So how do you think she would have reacted? This was the month after this home invasion had taken place. And then finally the next incident, a month later, the nanny having quit, since it's not much fun getting beaten up, they had a new housekeeper who was going to get some food at the grocery store and was accosted by two men saying, where's Lieutenant Ordonez? Do you know where he is? She came back and reported that to Lieutenant Ordonez and his cousin, both of whom were armed, they're military officers, who went out to look to see if there's anybody around. But I want to get back to the wife again because Niselaya, by the third incident, she quit her job, she couldn't sleep, she worried about the whereabouts of her children at all times, had to be accompanied everywhere she went. So at this point, you know, there's a pretty high level of fear. And let us remember that Boba Dia was a dangerous character. I mean, the articles we point to on the record at 344 and 348 alleged he killed two families, 11 people, including three minors. He threatened revenge against police, people who would arrest him. He was part of the still is. So having testified against his underlings, he, he, Ordonez was threatened, the family was threatened. So what do you think they would have thought had he had to testify against Boba Dia himself? And Boba Dia was extradited back to Honduras in 2007, January. Can I interrupt you just to ask, do you agree with the government's position that we essentially have to adjudicate this petition for review, pretending that Boba Dia is still alive? Because that was the last state of the record before the BIA? Well, yes. Well, we don't know for sure whether Boba Dia is alive or not. There are rumors that this might have all been a setup, that he may still be alive. I, as you know, notified the court that I had learned about this. It's a newspaper article. Okay. But that's not part of our record. And we are, as far as I can tell, we're evaluating the appeal based on what the Board of Immigration Appeal did. Right. So if we, if we thought that based on the record that existed back then, I don't even remember what year this was. It's probably a few years ago now. 2012. Okay. Two years, three years ago. If we agreed with you that the record was such that the BIA erred in not finding that your client had a reasonable fear of future persecution, we would just send it back. And I assume the government at that point would do whatever it's to do in terms of supplementing the record, and you would make whatever arguments you want to, right? Certainly, that would be acceptable. I will say, however, that since there is past persecution here, as far as we're concerned, there is still a rebuttable presumption of a well-founded fear of future persecution, and I don't believe the government has rebutted that at all. If there's a finding on remand regarding this death that may or may not have happened, then that can be taken up at that point, though, right? Neither party would suffer any prejudice unless I'm missing something. I want to hear from both of you about that, but that's my understanding of the state of affairs. You're saying that, yes, if we remand back to the BIA, we would reopen the record, and we would then introduce new evidence, I think, to establish what the current status is of the Atlantic Drug Cartel and Bobadilla's family. He's not the only one in this family. And what would be the risks of this family returning to Honduras? So, yes, that would be what we would do. That was exactly what I was going to say, that if it goes back down, presumably, at that point, the record would be made on the fear of future persecution, because we have no way of doing that, right? That's correct. Anything further? With that, I will save the rest of my time for rebuttal. Thank you, counsel. Thank you. I was waiting for you to trip over that. I'm impressed that you navigated successfully. Thank you. Good morning. May it please the Court. John Inglis on behalf of the United States. Your Honor, the Court should dismiss the petition for review because substantial evidence in the record supports the conclusion that petitioner was neither persecuted nor has a law found to fear future persecution. You mean deny? Excuse me? You mean deny the petition for review? Why would we Why is this record inadequate to establish past persecution? The record is inadequate to establish past persecution. There was no actual harm upon petitioner or her family, and the threats do not constitute past persecution. Let me ask you this. They came to her house. You're not disputing the facts that are in the record that they came to her house. They beat up the child, right? Does it have to be the exact person? They made a mistake, and I don't know if they made a mistake or just did it as a warning. Wouldn't that be enough to put her in genuine fear? I think that there was no genuine fear in the fact that she lived in the country for two and a half years thereafter, and harm upon a family member can constitute persecution. That was the content of the 28-J letter, and that was the court's holding in Sumalong. But the harm in Sumalong was far greater. In that case, the child died because they were denied or delayed health care based on being a Chinese Christian and a Muslim portion of the Philippines. In this case, there wasn't actually no harm to the child. So, counsel, I just want to get this straight. Sometimes it sounds like, and from your brief, it sounds like the government's position is that this harm was not severe enough. Other times, it seems to suggest that your concern is that the harm wasn't sufficiently, there wasn't a sufficient nexus to the petitioner, and then I want to ask whether or not you might be arguing that even if severe enough, there isn't a nexus to show that this wasn't attributable to some non-governmental force, because you seem to be doing a little bit of all three of those things here. So, the first question, sorry about that, there were three in there, but the first question just really goes to the severity of the harm. Is that really the government's position? This isn't bad enough to have a home invasion with a gun put the head of your toddler? I think it's reasonable that the board came to the conclusion that it came to. Okay, what's your best shot at that? I want to hear your strongest argument on that. Okay, I think it's reasonable that the board came to that conclusion that the immigration judge listening to the facts in the first instance arrived at that conclusion, that there was a home invasion, but none of the petitioners themselves were actually harmed. There is comments that the nanny was beaten up. There is not a lot of evidence in the record as to the that she was beaten and chained to a pipe. Is Judge Rothstein, I think she is correct, that Judge Rothstein's, I think the unstated assumption in her question is my understanding as well, which is that these folks were deemed credible, so we have to accept these facts as true. Is that right? That's correct. Okay. So, I'm not doubting the credibility of it. I'm saying that the record is not very detailed in the severity of what happened at that incident to somebody who is not a person in the family. Isn't your strongest point that there was that two and a half year gap? Well, I think that that's correct, Your Honor. Can I get you to focus on that rather than the severity? Because I don't know that the severity thing is going to get you very far in terms of deciding how severely you have to be beaten up before it gets to be severe. My only argument with the severity is, I agree that there's no well-founded fear when there's two and a half year gap, and there's a line of cases that support that. Our argument with respect to the incident that happened at the house is that it was, that a reasonable adjudicator, the immigration judge in the first instance, who was actually listening to these accounts, it was reasonable that they came to that conclusion that that didn't constitute persecution and that based on the substantial evidence standard, I think that the court should in the first instance, I recognize the court might come to a different conclusion, but that was a reasonable determination. I think that when we look at all the incidents in this case, the last incident of harm occurred in late 2004, and Petitioner and her family did not leave until she left in March of 2007, and then the rest of her family left in May of 2000, and nothing else happened during that time. Let me make sure I have the chronology right. I thought that this last incident occurred shortly after the husband testified against the underlings, is that right? That's correct. And it was contemplated that he would then be forced to test, not forced, but he would then need to testify against the main guy, but the main guy escaped, killed some people in the prison and got away, and so there was no pending trial at which the husband would need to testify, and so that might have explained why nothing was going on, but then he got recaptured sometime later, and so then all of a sudden the trial was something that was looming, and that's the point at which they left. Have I got the chronology right there? I think that's the chronology, Your Honor. I would add in a few points there that Bobadilla was part of a large cartel, and the stated fear in this case is not solely against Bobadilla, it's against Bobadilla and the cartel, because the threats, the people who came to the house, there's no allegation that that was Bobadilla in and of himself, so in 2005 and 2006, that cartel was still in Honduras, and he might have been in Colombia, but there was still that prospect of prosecution in Honduras if there was going to be harm to Petitioner, I think it's reasonable to say that it still could have happened in 2005 and 2006, and so that gap is still significant. Counsel, can you remind me, what is the record about the number of times these folks moved home, the first home invasion occurred and they moved, I think? Do you know the date of that? I believe they moved to Tegucigalpa in the middle of 2004, and I'm sorry on the exact date, maybe Counsel can correct me on that, and that there had been some relocation, but he maintained his fairly prominent job working for the Honduran government during this period, and there's no evidence in the record that they were searching for him during that time. Well, but the new nanny had an incident too, right? But that was also in 2004, I believe that that was in, sorry, the new nanny was contacted regarding the whereabouts in November of 2004. Right, I see it, sorry. And that was the last time that there was any contact either in person or, you know, a threat telephonically between Petitioner's family and the cartels. Okay. Further? Can I just make one other comment based on what opposing counsel said? He stated that one of the issues was whether or not this was on account of a protected ground. That was an issue that was assumed by the board, and if the court were to make the determination that there was past persecution and or fear, well-founded fear of future persecution, it's the government's position that the case should be remanded for that determination. And the law has changed in the interim, right, on that exact issue? Right, so that the board can make a determination as to whether that was a cognizable particular social group. And, I'm sorry, one other quick comment. It's the government's position that this case should not be remanded for determination as to whether or not the record is stale and whether or not Bobadilla's death changes things. If Petitioner's counsel would like, they can file a motion to reopen with the board to examine that issue. Well, I assume that that was a new fact that you or your client, the Attorney General, would want the record to be supplemented with. It doesn't help them. That the person that they could, we could send it back for an examination upon that, Your Honor. I guess what I'm saying is that it's the government's position that there's, based on the record as it is, there's no well-founded fear, there's no past persecution. So as a result, with the stronger case as what it was when this was briefed, there was no persecution. But if we did decide that there was past persecution and we did send it back, surely what the government would want to do is have the opportunity to flesh out the record on future persecution, right? Yes. Thank you very much, Your Honors. Thank you. Watch that briefcase. Your Honors, first to address the severity of harm issue. It's true, Sumlang, the harm was indeed very severe. The baby died. In Mashiri v. Ashcroft, the severity was the mother saw her child having been bloodied in a fight on the street. She saw Afghan business down the street set on fire. She read newspaper articles about what was happening to Afghans in this town in Germany. And that was enough for the court to establish that she herself suffered harm even though it was not her personal experience. And obviously, that's the position in Sumlang also. The two and a half year gap is clearly an issue. But let's remember that the first part of that period, they did move, I think, at least twice. They moved their daughter, they changed their daughter's school three times. That's on the record. That's on the record at page 466. Do you agree with government counsel's assertion that your client's the basis for her fear was not just Bobadilla, but rather the cartel as a whole? Absolutely. Yes. And so why isn't government counsel right then that merely because he had escaped and was sort of at large for a period, the threat from the cartel, obviously, they had lost all this cocaine was still in place. Why doesn't that two year or two year plus gap take at its significance then? Well, I think the cause of the death threat phone call was when he was testifying against the underlings. Lieutenant Ordonez, her husband, it was obviously sort of the driving force in this family. And he was incredibly afraid that if he had to testify against Bobadilla, bad things would happen. She was afraid of the drug cartel the moment he arrested Bobadilla. She was not party to all the details of why things would be so dangerous, but she was afraid the moment he arrested her. In fact, at first, he didn't even tell her that he had arrested her because he knew how fearful she would be. That's Judge Watford's point. Yes. That there's a whole cartel out there and yet these folks remained in country for two and a half years. True. But Bobadilla fled to Colombia. We don't know whether he took his henchmen with him, the ones who went with him to Bobadilla. I can't speculate on why they were not attacked during that time. But I also know that according to the Lim case, that there can be a dormant period that doesn't negate past persecution. And this dormant period did indeed exist. But as soon as he came back, as soon as they saw the newspapers about extradition, they went into action. That was why they, we've got to get out of here because he's a scary guy. He's back. They're going to make me testify. And she, as his wife, was absolutely terrified. That's all. You're out of time. Thank you very much. Thank you very much. And I thank you for your time. Okay. Thank you both. That case is submitted and we'll go on to the next case on the calendar.
judges: Christen, Watford, Rothstein